

November 14, 2018

Una O'Boyle, Clerk of Court
US Bankruptcy Court
District of Delaware
824 Market Street, 3rd Floor
Wilmington, DE 19801

To the Clerk of the Court:

This letter is a proof of claim of Butternut Tree LLC as creditor in Re: CrediMAC PBC, Case No. 18-12354-KJC. Enclosed herein is a Convertible Note Purchase Agreement showing that Butternut Tree LLC is a $50,000 creditor. Also enclosed is the notice from the Court that there are assets from which a dividend might possibly be paid to creditors.

Thank you,

Peter Ort, Managing Member
Butternut Tree LLC
12 Roszel Road, Suite B102
Princeton, NJ 08540
Tel: 609-306-5115
email: peter@ort.com

# UNITED STATES BANKRUPTCY COURT
## District of Delaware
## 824 Market Street, 3rd Floor
## Wilmington, DE 19801

**In Re:**
CrediMAC PBC

**Chapter:** 7

403 Main Street
Suite 215
Buffalo, NY 14203
  EIN: 81-5447572

**Case No.:** 18-12354-KJC

## NOTICE THAT THERE ARE ASSETS FROM
## WHICH A DIVIDEND MIGHT POSSIBLY BE PAID TO CREDITORS

**YOU ARE HEREBY NOTIFIED** that there are assets from which a dividend might possibly be paid to creditors.

In order to share in any distribution, a creditor must file a proof of claim with the Clerk of the Bankruptcy Court. Claims must be filed within ninety (90) days after service of this notice.

For governmental entities, the proof of claim deadline shall be the longer of one-hundred eighty (180) days after the petition was filed or ninety (90) days after this Notice of Assets is served or as otherwise provided in the Federal Rules. Late claims will not be allowed. A proof of claim may be filed either electronically or as a paper document. For information on how to file a claim, visit the United States Bankruptcy Court – District of Delaware website at (http://www.deb.uscourts.gov), and click on the "Programs & Services" tab – Claims Information.

*Una O'Boyle*

Una O'Boyle, Clerk of Court

Dated: 11/1/18
(VAN-043)

## NOTE PURCHASE AGREEMENT

**THIS NOTE PURCHASE AGREEMENT** (this "Agreement") is made as of August 29, 2017 (the "Agreement Date"), by and among **PLACEHOLDER DEBT SETTLEMENTS, PUBLIC BENEFIT CORPORATION D/B/A CREDIMAC**, a Delaware public benefit corporation (the "Company"), and the lenders (each individually a "Lender," and collectively the "Lenders") named on the Schedule of Lenders attached hereto (the "Schedule of Lenders"). Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in Section 1 below.

**WHEREAS**, each of the Lenders intends to provide certain Consideration to the Company as described for each Lender on the Schedule of Lenders;

**WHEREAS**, the parties wish to provide for the sale and issuance of Notes in return for the provision by the Lenders of the Consideration to the Company; and

**WHEREAS**, the parties intend for the Company to issue in return for the Consideration one or more Notes.

**NOW, THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:**

1. Definitions.

    (a) "Cash-Flow Positive" shall mean as measured on the last day of any given month after the Agreement Date, an aggregate cash balance in the Company's bank accounts in excess of the aggregate outstanding principal amount of the Notes as of such date.

    (b) "Common Stock" shall mean the Company's Common Stock.

    (c) "Consideration" shall mean the amount of money paid by each Lender pursuant to this Agreement as shown on the Schedule of Lenders.

    (d) "Conversion Price" shall mean:

    (i) if the Notes are converted to equity pursuant to Section 2.2(a) below, the lesser of (A) 80% of the price paid per share for Equity Securities by the investors in the Next Equity Financing or (B) the quotient resulting from dividing (i) the Valuation Cap by (ii) the number of shares of common stock of the Company outstanding immediately prior to the closing of the Next Equity Financing (assuming conversion of all securities into common stock, exercise of all outstanding options to purchase common stock, but excluding, for this purpose, the shares reserved or authorized for issuance under any equity incentive plan and, if applicable, any pool increase or new pool adopted in connection with the Next Equity Financing (limited in the aggregate to 10% of the fully-diluted capitalization) and shares issued or issuable upon conversion of all convertible indebtedness of the Company, including, without limitation, the Notes);

(ii) if the Notes are converted to equity pursuant to Section 2.2(b) or Section 2.2(d) below, the quotient resulting from dividing (i) the Valuation Cap by (ii) the number of shares of common stock of the Company outstanding immediately prior to the applicable conversion (assuming conversion of all securities into common stock, exercise of all outstanding options to purchase common stock, but excluding, for this purpose, the shares reserved or authorized for issuance under any equity incentive plan (limited in the aggregate to 10% of the fully-diluted capitalization assuming conversion of all of the Notes) and shares issued or issuable upon conversion of all convertible indebtedness of the Company, including, without limitation, the Notes); and

(iii) if the Notes are converted to equity pursuant to Section 2.2(c) below, the quotient resulting from dividing (i) the Valuation Cap by (ii) the number of shares of common stock of the Company outstanding immediately prior to the closing of the Corporate Transaction (assuming conversion of all securities into common stock, exercise of all outstanding options to purchase common stock, but excluding, for this purpose, the shares reserved or authorized for issuance under any equity incentive plan and shares issued or issuable upon conversion of all convertible indebtedness of the Company, including, without limitation, the Notes).

(e) "Conversion Shares" shall, for purposes of determining the type of Equity Securities issuable upon conversion of the Notes, mean:

(i) if the Notes are converted to equity pursuant to Section 2.2(a) below, (1) a number of shares of Equity Securities issued in the Next Equity Financing obtained by dividing (w) all principal and unpaid and accrued interest under such Note by (x) the price per share of stock sold by the Company in the Next Equity Financing (such number of shares, the "Adjusted Number of Preferred Shares"), and (2) shares of Common Stock of the Company equal to (y) the total number of Equity Securities that would be issuable upon the conversion of such Note at the Conversion Price but for the operation of this paragraph, less (z) the Adjusted Number of Preferred Shares; and

(ii) if the Notes are converted to equity pursuant to Section 2.2(b), Section 2.2(c) or Section 2.2(d) below, shares of Common Stock.

(f) "Corporate Transaction" shall mean (i) the closing of the sale, transfer or other disposition of all or substantially all of the Company's assets, (ii) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of the Company or the surviving or acquiring entity), (iii) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of the Company's securities), of the Company's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of the Company (or the surviving or acquiring entity) or (iv) a liquidation, dissolution or winding up of the Company; provided, however, that a transaction shall not constitute a Corporate Transaction if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in

substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction.

(g) "Equity Securities" shall mean the Company's Common Stock or Preferred Stock or any securities conferring the right to purchase the Company's Common Stock or Preferred Stock or securities convertible into, or exchangeable for (with or without additional consideration), the Company's Common Stock or Preferred Stock, except any security granted, issued and/or sold by the Company to any director, officer, employee or consultant of the Company in such capacity for the primary purpose of soliciting or retaining their services.

(h) "Financial Metric Conversion" shall mean a conversion pursuant to Section 2.2(d).

(i) "Founders" shall mean Steven Katz, Ignacio Fanlo, Keith Dutton and Paul Wilkins.

(j) "Initial Public Offering" shall mean the closing of the issuance and sale of shares of Equity Securities of the Company in the Company's first underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Act").

(k) "Majority Noteholders" shall mean the holders of a majority in interest of the aggregate outstanding principal amount of Notes.

(l) "Maturity Conversion" shall mean a conversion pursuant to Section 2.2(b).

(m) "Maturity Date" shall mean August 29, 2019.

(n) "Next Equity Financing" shall mean the next bona fide sale (or series of related sales) by the Company of its Equity Securities following the Agreement Date conducted for equity financing purposes.

(o) "Notes" shall mean the one or more promissory notes issued to each Lender pursuant to Section 2.1, the form of which is attached hereto as Exhibit A.

(p) "Valuation Cap" shall mean $12,000,000.

2. Terms of the Notes.

2.1 Issuance of Notes. In return for the Consideration paid by each Lender, the Company shall sell and issue to such Lender one or more Notes. Each Note shall have a principal balance equal to the Consideration paid by such Lender for the Note, as set forth in the Schedule of Lenders. Each Note shall be convertible into Conversion Shares pursuant to Section 2.2.

2.2     Right to Convert Notes.

(a)     Next Equity Financing.  The then outstanding principal and unpaid accrued interest of each Note will be automatically converted into Conversion Shares upon the closing of the Next Equity Financing. The number of Conversion Shares to be issued upon such conversion pursuant to this Section 2.2(a) shall be equal to the quotient obtained by dividing the outstanding principal and unpaid accrued interest on a Note to be converted, or portion thereof, on the date of conversion, by the Conversion Price. Subject to Section 6.12 below, the issuance of Conversion Shares pursuant to the conversion of each Note shall be upon and subject to the same terms and conditions applicable to the Equity Securities sold in the Next Equity Financing.

(b)     Maturity Conversion.  If, after the Maturity Date, the Next Equity Financing or Corporate Transaction has not occurred prior to full payment of a Note or prior to the time when a Note may otherwise be converted (as provided herein), the principal and unpaid accrued interest of each Note may be converted, at the option of each Lender, in whole or in part, into Conversion Shares. The number of Conversion Shares to be issued upon conversion pursuant to this Section 2.2(b) shall be equal to the quotient obtained by dividing (i) the outstanding principal and unpaid accrued interest due on a Note to be converted on the date of the conversion by (ii) the Conversion Price.

(c)     Corporate Transaction.  In the event of a Corporate Transaction prior to full payment of a Note or prior to the time when a Note may be converted (as provided herein), at the Lender's election and upon delivery of written notice to the Company, (i) such Lender shall be paid an amount equal to (x) one times (1.0x) all outstanding principal of the Note held by such Lender plus (y) all accrued and unpaid interest of such Note, or (ii) in lieu of any other amounts otherwise due or payable, including such payments described in Section 2.2(c)(i), all outstanding principal and unpaid accrued interest due on such Note shall be converted into Conversion Shares immediately prior to the closing of the Corporate Transaction. If applicable, the number of Conversion Shares to be issued upon conversion shall be equal to the quotient, obtained by dividing (A) the outstanding principal and unpaid accrued interest due on a Note to be converted on the date of the conversion by (B) the Conversion Price.

(d)     Financial Metric Conversion.  Either upon (i) the written consent of the Majority Noteholders or (ii) in the event the Company becomes Cash-Flow Positive prior to full payment of a Note, the entire principal and unpaid accrued interest of each Note shall be automatically converted into Conversion Shares. The number of Conversion Shares to be issued upon conversion pursuant to this Section 2.2(d) shall be equal to the quotient obtained by dividing (i) the outstanding principal and unpaid accrued interest due on a Note to be converted on the date of the conversion by (ii) the Conversion Price.

(e)     No Fractional Shares.  Upon the conversion of a Note into Conversion Shares, in lieu of any fractional shares to which the Lender would otherwise be entitled, the Company shall pay such Lender cash equal to such fraction multiplied by the Conversion Price.

(f)     Mechanics of Conversion.  If a Lender's Notes are not automatically converted into Conversion Shares, before such Lender shall be entitled to convert the same into Conversion Shares, such Lender shall give written notice to the Company of the election to

convert such Notes into Conversion Shares. The Company shall not be required to issue or deliver the Conversion Shares until the Lender has surrendered the Note to the Company.

(g) Prepayment of the Notes. Prior to the Maturity Date, the Notes may not be prepaid without the consent of the Majority Noteholders. Any prepayment must be made in connection with the prepayment of all outstanding Notes held by Lenders timely upon notifying the Company of their consent to have all or a portion of their Notes prepaid. Such prepayment shall be made on a pro rata basis based on the respective aggregate outstanding amount of each Note to be prepaid.

3. Closing Mechanics.

3.1 Closing. The initial closing (the "Closing") of the purchase of the Notes in return for the Consideration paid by each Lender shall take place remotely via the exchange of documents and signatures on the Agreement Date, or at such other time and place as the Company and Lenders purchasing a majority in interest of the aggregate principal amount of the Notes to be sold at the initial Closing agree upon orally or in writing. At the Closing, each Lender shall deliver the Consideration to the Company and the Company shall deliver to each Lender one or more executed Notes in return for the respective Consideration provided to the Company.

3.2 Subsequent Closings. In any subsequent closing (each a "Subsequent Closing"), the Company may sell additional Notes subject to the terms of this Agreement to any Lender as it shall select; provided that the aggregate amount of Consideration does not exceed $7,500,000. Any subsequent purchasers of Notes shall become a party to, and shall be entitled to receive Notes in accordance with this Agreement and shall be a "Lender" for all purposes hereunder. Each Subsequent Closing shall take place at such locations and at such times as shall be mutually agreed upon orally or in writing by the Company and such purchasers of additional Notes. The Schedule of Lenders shall be automatically updated to reflect the issuance of Notes in any Subsequent Closing.

4. Representations and Warranties of the Company. In connection with the transactions provided for herein, the Company hereby represents and warrants to the Lenders that as of the initial Closing:

4.1 Organization, Good Standing and Qualification. The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

4.2 Authorization. Except for the authorization and issuance of the shares issuable in connection with the conversion of the Notes, all corporate action has been taken on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Notes. Except as may be limited by applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement

of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Notes, the valid and enforceable obligations they purport to be.

    4.3  Valid Issuance of Stock. The Conversion Shares to be issued, sold and delivered upon conversion of the Notes will be duly authorized and validly issued, fully paid and nonassessable and, based in part upon the representations and warranties of the Lenders in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

    5.  Representations and Warranties of the Lenders. In connection with the transactions provided for herein, each Lender hereby represents and warrants to the Company as of the initial Closing or Subsequent Closing (as applicable) that:

    5.1  Authorization. This Agreement constitutes such Lender's valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (a) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights and (b) laws relating to the availability of specific performance, injunctive relief or other equitable remedies. Each Lender represents that it has full power and authority to enter into this Agreement.

    5.2  Purchase Entirely for Own Account. Each Lender acknowledges that this Agreement is made with Lender in reliance upon such Lender's representation to the Company that the Notes, the Conversion Shares, and any Common Stock issuable upon conversion of the Conversion Shares (collectively, the "Securities") will be acquired for investment for Lender's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Lender has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each Lender further represents that such Lender does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities.

    5.3  Disclosure of Information. Each Lender acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire the Securities. Each Lender further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities.

    5.4  Investment Experience. Each Lender is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. If other than an individual, each Lender also represents it has not been organized solely for the purpose of acquiring the Securities.

    5.5  Accredited Investor. Each Lender is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

5.6     Restricted Securities.  Each Lender understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. Each Lender represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

5.7     Further Limitations on Disposition.  Without in any way limiting the representations and warranties set forth above, each Lender further agrees not to make any disposition of all or any portion of the Securities unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 5, Section 6.11 and:

(a)     There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)     (i) Lender has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and (ii) if reasonably requested by the Company, Lender shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in extraordinary circumstances.

5.8     Legends.  It is understood that the Securities may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

5.9     Bad Actor Representations and Covenants.  Each Lender hereby represents and warrants to the Company that such Lender has not been convicted of any of the felonies or misdemeanors or has been subject to any of the orders, judgments, decrees or other conditions set forth in Rule 506(d) of Regulation D promulgated by the SEC. Each Lender covenants to provide immediate written notice to the Company in the event such Lender is convicted of any felony or misdemeanor or becomes subject to any order, judgment, decree or other condition set forth in Rule 506(d) of Regulation D promulgated by the SEC, as may be amended from time to time. Each Lender covenants to provide such information to the Company as the Company may reasonably request in order to comply with the disclosure obligations set forth in Rule 506(e) of Regulation D promulgated by the SEC, as may be amended from time to time.

5.10   Founder Base Salary Covenant. For the twelve month period following the Agreement Date, the salary of the Founders shall receive a below-market aggregate base salary as set forth on Exhibit B, after which the Founders' salaries shall be determined by the Board in its reasonable discretion, in accordance with market based principles.

6.   Miscellaneous.

6.1   Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties, provided, however, that the Company may not assign its obligations under this Agreement without the written consent of the Majority Noteholders. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.2   Governing Law. This Agreement and the Notes shall be governed by and construed under the laws of the State of Delaware .

6.3   Counterparts. This Agreement may be executed by electronic signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument. Counterparts may be delivered by facsimile, electronic mail (including .pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.4   Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.5   Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 6.5):

If to the Company:

PLACEHOLDER DEBT SETTLEMENTS, PUBLIC BENEFIT
CORPORATION D/B/A CREDIMAC
The Brisbane Building, Suite 215
403 Main St.
Buffalo, NY 14203
Attention: Chief Executive Officer

If to Lenders:

At the respective addresses shown on the signature pages hereto.

      6.6    Finder's Fee. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Lender agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which Lender or any of its officers, partners, employees or representatives is responsible. The Company agrees to indemnify and hold harmless Lender from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

      6.7    Attorneys Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

      6.8    Entire Agreement; Amendments and Waivers. This Agreement, the Notes and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The Company's agreements with each of the Lenders are separate agreements, and the sales of the Notes to each of the Lenders are separate sales. Nonetheless, any term of this Agreement or the Notes may be amended and the observance of any term of this Agreement or the Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Noteholders. Any waiver or amendment effected in accordance with this Section shall be binding upon each party to this Agreement and any holder of any Note purchased under this Agreement at the time outstanding and each future holder of all such Notes.

      6.9    Effect of Amendment or Waiver. Each Lender acknowledges that by the operation of Section 6.8 hereof, the Majority Noteholders will have the right and power to diminish or eliminate all rights of such Lender under this Agreement and each Note issued to such Lender.

      6.10    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and

the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

      6.11    "Market Stand-Off" Agreement. Each Lender hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the registration by the Company of shares of its Common Stock or any other equity securities under the Act on a registration statement on Form S-1, and ending on the date specified by the Company and the managing underwriter (such period not to exceed (x) one hundred eighty (180) days in the case of the Initial Public Offering, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto, or (y) ninety (90) days in the case of any registration other than the Initial Public Offering, or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock held immediately before the effective date of the registration statement for such offering or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Section 6.11 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, or the transfer of any shares to any trust for the direct or indirect benefit of the Lender or the immediate family of the Lender, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value, and shall be applicable to the Lenders only if all officers and directors are subject to the same restrictions and the Company obtains a similar agreement from all stockholders individually owning more than one percent (1%) of the Company's outstanding Common Stock (after giving effect to conversion into Common Stock of all outstanding Preferred Stock). The underwriters in connection with such registration are intended third-party beneficiaries of this Section 6.11 and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto. Each Lender further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this Section 6.11 or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Lenders subject to such agreements, based on the number of shares subject to such agreements. Each Lender agrees that a legend reading substantially as follows shall be placed on all certificates representing all Securities of each Lender (and the shares or securities of every other person subject to the restriction contained in this Section 6.11):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD AFTER THE EFFECTIVE DATE OF THE ISSUER'S REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

6.12    Financing Agreements. Each Lender understands and agrees that the conversion of the Notes into Conversion Shares may require such Lender's execution of certain agreements in the form agreed to by investors in the Next Equity Financing relating to the purchase and sale of such securities as well as registration, co-sale, rights of first refusal, rights of first offer, voting rights and market stand-off, if any, relating to such securities.

6.13    Exculpation Among Lenders. Each Lender acknowledges that it is not relying upon any person, firm, corporation or stockholder, other than the Company and its officers and directors in their capacities as such, in making its investment or decision to invest in the Company. Each Lender agrees that no other Lender nor the respective controlling persons, officers, directors, partners, agents, stockholders or employees of any other Lender shall be liable for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase and sale of the Securities.

6.14    Acknowledgement. In order to avoid doubt, it is acknowledged that each Lender shall be entitled to the benefit of all adjustments in the number of shares of Common Stock of the Company issuable upon conversion of the Preferred Stock of the Company or as a result of any splits, recapitalizations, combinations or other similar transaction affecting the Common Stock or Preferred Stock underlying the Conversion Shares that occur prior to the conversion of the Notes.

6.15    Further Assurance. From time to time, the Company shall execute and deliver to the Lenders such additional documents and shall provide such additional information to the Lenders as any Lender may reasonably require to carry out the terms of this Agreement and the Notes and any agreements executed in connection herewith or therewith, or to be informed of the financial and business conditions and prospects of the Company.

[*Signature Page Follows*]

      IN WITNESS WHEREOF, the below parties have executed this Agreement as of August 29, 2017.

                                        **COMPANY:**

                                        **PLACEHOLDER DEBT SETTLEMENTS, PUBLIC BENEFIT CORPORATION D/B/A CREDIMAC**

                                        By: *Steven Katz*
                                        Name: Steven Katz
                                        Title: Chief Executive Officer

IN WITNESS WHEREOF, the parties have executed this Agreement as of August 30, 2017.

**LENDERS:**

**If an Individual:**

By: _____
          (signature of individual)

Name: _____
          (print name individual)

**If an Entity:**

Entity: __BUTTERNUT TREE LLC__
          (print name of entity)

By: _____
          (signature of authorized signatory)

Name: __PETER ORT__
          (print name of authorized signatory)

Title: __MANAGING MEMBER__
          (print title of authorized signatory)

Address: __12 ROSZEL ROAD, SUITE B102__
          __PRINCETON, NJ 08540__

Email: __peter@ort.com__

## Exhibit A

Form of Convertible Promissory Note

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.

## CONVERTIBLE PROMISSORY NOTE

Date of Issuance

$[__]                                                                                                              [__], 2017

FOR VALUE RECEIVED, Placeholder Debt Settlements, Public Benefit Corporation d/b/a CrediMac, a Delaware public benefit corporation (the "Company"), hereby promises to pay to the order of [_____] (the "Lender"), the principal sum of [__] ($[__]), together with interest thereon from the date of this Note.  Interest shall accrue at a rate of five percent (5%) per annum, compounded annually computed on the basis of the actual number of days elapsed and a year of 365 days.  Unless earlier converted into Conversion Shares pursuant to Section 2.2 of that certain Note Purchase Agreement dated [__], 2017 among the Company, Lender and certain other investors (the "Purchase Agreement"), the principal and accrued interest shall be due and payable by the Company on the Maturity Date.

This Note is one of a series of Notes issued pursuant to the Purchase Agreement, and capitalized terms not defined herein shall have the meaning set forth in the Purchase Agreement.

1. Payment. All payments shall be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the holder hereof may from time to time designate in writing to the Company. Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal. Prepayment of principal, together with accrued interest, may only be made pursuant to Section 2.2(g) of the Purchase Agreement. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

2. Security. This Note is a general unsecured obligation of the Company.

3. Conversion of the Notes. This Note and any amounts due hereunder shall be convertible into Conversion Shares in accordance with the terms of Section 2.2 of the Purchase Agreement. As promptly as practicable after the conversion of this Note, the Company at its expense shall issue and deliver to the holder of this Note a certificate or certificates for the number of full Conversion Shares issuable upon such conversion as set forth in the Purchase Agreement.

4. Amendments and Waivers; Resolutions of Dispute; Notice. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or

relating to this Note and the provision of notice shall be conducted pursuant to the terms of the Purchase Agreement.

5. <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the successors and assigns of the parties hereto; <u>provided, however</u>, that the Company may not assign its obligations under this Note without the written consent of the Majority Note Holders. Any transfer of this Note may be effected only pursuant to the Purchase Agreement and by surrender of this Note to the Company and reissuance of a new note to the transferee. The Lender and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Company and any other Lenders.

6. <u>Officers and Directors not Liable</u>. In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

7. <u>Expenses</u>. The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the holder of this Note in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("Costs"). The Company agrees that any delay on the part of the holder in exercising any rights hereunder will not operate as a waiver of such rights. The holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

8. <u>Governing Law</u>. This Note shall be governed by and construed under the laws of the State of California as applied to other instruments made by California residents to be performed entirely within the State of California.

9. <u>Loss, Theft, Destruction or Mutilation of Note</u>. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note and, in the case of loss, theft or destruction, delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company or, in the case of mutilation, on surrender and cancellation of this Note, the Company shall execute and deliver, in lieu of this Note, a new Note executed in the same manner as this Note, in the same principal amount as the unpaid principal amount of this Note and dated the date to which interest shall have been paid on this Note or, if no interest shall have yet been so paid, dated the date of this Note.

10. <u>Usury</u>. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

11. <u>Waivers</u>. The Company hereby waives presentment, demand, notice, protest and all other demands and any other notices (whether or not required by law) in connection with said delivery, acceptance, performance, default or enforcement of this Note. The Company hereby waives and renounces any and all exemption rights under or by virtue of the laws of any state, or

## Exhibit B

Founder Base Salary Schedule

Steven Katz: $275,000

Ignacio Fanlo: $225,000

Keith Dutton: $200,000

Paul Wilkins: $150,000